## Winchester, et al. v. Watson, et al.

(Decided March 16, 1916.)

### Appeal from McCreary Circuit Court.

1. Trial—Transfer of Causes.—When the issue involved in an equitable action is purely a legal one, and the equitable right depends upon the decision of the legal issue, the case, on motion, must be transferred for a jury trial of the legal issue; the trial court has no discretion in the matter.

2. Jury—Bystanders—Appeal and Error.—A jury containing more than three bystanders is in contravention of section 2247 of the Kentucky Statutes and constitutes a reversible error, if proper objection to the selection of the jury be saved, and the irregularity be not waived.

3. Appeal and Error—When Verdict of Jury Will Not be Disturbed.—When a distinct legal issue is submitted to a jury in an action properly begun in equity and transferred to the ordinary docket for the settlement of the legal issue, the verdict of the jury is to be treated as in ordinary jury trials, and will not be disturbed unless palpably against the evidence.

.4. Trial—Instruction Upon Adverse Possession.—An instruction upon adverse possession should be based upon the defendants' "possession" of the land in question, for fifteen years; it is improper for such an instruction to substitute the word "held" in place of the word "possession."

5. Appeal and Error—Misconduct of Counsel.—An objection to the misconduct of counsel in his argument to the jury, is not subject to review by the Court of Appeals where it appears only in the grounds for a new trial that an objection was made at the time the argument was made.

6. Appeal and Error—Failure to Offer Instruction on Issue Raised by Pleadings.—Where a party did not offer an instruction on an issue raised by the pleadings and the proof, he cannot, upon appeal, complain of the trial court's failure to instruct upon that question.

STEPHENS & STEELY, L. G. CAMPBELL and H. C. GILLIS for appellants.

W. R. CRESS & SON for appellees.

Opinion of the Court by Chief Justice Miller—Reversing.

In 1855, Joseph Winchester obtained a patent for a tract of between 70 and 100 acres of land in that part of Wayne county which is now a part of McCreary county.

Many years ago, the exact time not being shown, Joseph Winchester removed to Tennessee, leaving the land above mentioned in the possession of his daughter, Betsy Troxell. He married a second time, and died in Tennessee in 1881, intestate.

The children by his first marriage were Betsy Troxell, Jane Miles, Rachel Smith, and Zarilda Lewis; those by his second marriage, and who lived in Tennessee, were W. R., Henry W., Samuel, and Frank Winchester, the last named son having since died in Texas, leaving a widow and eight children surviving him.

On January 4th, 1901, Betsy Troxell sold and conveyed her undivided interest in the tract to Sherman Watson for a consideration of $20.00; and, on January 15th, 1912, for the sum of one dollar and other valuable consideration, Jane Miles, Rachel Smith and Zarilda Lewis likewise conveyed their undivided interests to Sherman Watson. Mrs. Troxell's deed did not recite what her undivided interest was; the joint deed of the other three daughters recites that it conveyed an undivided three-fourths interest. At that time Watson was living upon the land, holding it in the way which will be hereinafter shown.

Under his purchase from Mrs. Troxell, Mrs. Miles, Mrs. Smith and Mrs. Lewis, Watson became the owner of an undivided one-half interest in the land.

In 1911, Sherman Watson sold the timber upon the land to C. C. Cooper and Newton King, Jr., for $460.00.

On July 20th, 1913, W. R. Winchester, Henry W. Winchester, and Samuel Winchester, as joint owners, brought this action under section 490 of the code, against Sherman Watson, C. C. Cooper, Newton King, Jr., and the unknown heirs of Frank Winchester, deceased, seeking a sale of the tract, on the ground of its indivisibility, and a division of the proceeds among the several joint owners. The plaintiffs also asked that Sherman Watson be required to account for the timber he had sold to Cooper and King, alleging that it was worth $1,000.00; and, to more surely accomplish that purpose, Cooper and King were also made defendants.

By the original answer, Sherman Watson denied the joint ownership of the plaintiffs and Frank Winchester's heirs, and claimed to be the owner of the entire tract by reason of his purchase from Mrs. Troxell, Mrs. Miles, Mrs. Smith, and Mrs. Lewis, alleging that the plaintiffs and Frank Winchester, who claimed to be children of Joseph Winchester by his second marriage, were bastards, and not the heirs of Joseph Winchester.

It having been shown, however, beyond any question, that the children by the second marriage of Joseph Winchester were legitimate, the defendants withdrew their original answer and filed in lieu thereof an amended answer, in which the defendant Sherman Watson expressly admitted the legitimacy of the plaintiffs and of Frank Winchester, and set up, for the first time, a claim to the greater part of the tract by adverse possession of more than 15 years through and under his brothers, Nathan Watson and Wash Watson.

The amended answer further admits that the land now claimed by Sherman Watson by adverse possession, did not embrace the entire original Joseph Winchester patent, but alleged that two small tracts, which it described by metes and bounds, lie upon the outside of and are not included in Sherman Watson's boundary; and that the plaintiffs' and Frank Winchester's heirs, jointly own these two small tracts, with Sherman Watson. The acreage of these two small tracts is, however, not given.

By their reply, the plaintiffs traversed all the material allegations of the answer, and interposed a plea of estoppel against the defendants, based upon the acts and conduct of Sherman Watson in taking the deeds of his vendors, Mrs. Troxell, Mrs. Miles, Mrs. Smith, and Mrs. Lewis, it being claimed that, by the provisions of those deeds, as well as by his original answer, Sherman Watson had admitted that he only owned the interests which had belonged to Betsy Troxell and her three sisters; and, that as he did not then claim to own any interest in any other way, or by any other title, he was now estopped from claiming to own the remaining one-half interest by adverse possession.

By an amended petition, the plaintiffs charged Watson with wanton waste and damage to the extent of $1,000.00, for cutting and wasting the timber upon the land, and asked treble damages therefor under the statute.

Over the plaintiffs' objection, the action was transferred to the ordinary docket for the purpose of trying the question of Sherman Watson's adverse possession of that portion of the tract so claimed by him.

A jury trial resulted in a verdict for the defendants, and the plaintiffs appeal.

1.   The motion to transfer the case to the ordinary docket for the purpose of trying the issue of adverse possession, was properly sustained.

Section 12 of the code reads as follows:

"In an equitable action, properly commenced as such, either party may, by motion, have the case transferred to the ordinary docket for the trial of any issue concerning which he is entitled to a jury trial; but either party may require every equitable issue to be disposed of before such transfer."

This action under section 490 for the sale of the land in question on account of its indivisibility, was properly commenced as an equitable action.   But when the issue involved in an equitable action is purely a legal one, and the equitable right depends upon the decision of the legal issue, as here, the case, on motion, must be transferred for a jury trial of the legal issue; and, the trial court has no discretion in that matter.   Hill v. Phillips, 87 Ky., 169; O'Connor v. Henderson Bridge Co., 95 Ky., 633; Carder v. Weissenburgh, 95 Ky., 135; Morawick v. Martineck, 128 Ky., 155.

And, when a distinct legal issue is submitted to a jury in an action begun in equity and transferred for a settlement of the legal issue, the verdict of the jury is to be treated as in ordinary jury trials, and will not be disturbed unless palpably against the evidence.   Hill v. Phillips, supra; Morawick v. Martineck, supra.

2.   It is next insisted that the judgment must be reversed for error of the court in selecting the jury.

During the same term of court at which this case was tried, two other cases had been tried in which the ownership of parts of the same tract of land claimed by Sherman Watson was involved; and for that reason the court was of opinion that a new jury should try this case.   Instead, however, of drawing a new panel from the drum, as required by section 2247 of the Kentucky Statutes, the circuit court directed the sheriff to summon 20 bystanders; and, to that ruling the plaintiffs objected and excepted.   After the entire jury had been made up of

bystanders, the plaintiffs challenged the panel for cause; but this objection was also overruled, and the plaintiffs again excepted. The cause was then tried by a jury composed entirely of bystanders.

Under section 2247 of the Kentucky Statutes, it is the duty of the trial judge in the case of a shortage of jurors, to draw from the drum or wheel-case the number of names necessary to supply the places of those jurors who have been excused, or who have failed to attend, and the jurors so selected shall be summoned by the sheriff; and if there should yet remain a shortage, the judge is given the power to direct the sheriff to summon not exceeding three bystanders, to supply the vacancies.

In construing this statute in L. & N. R. R. Co. v. King, 161 Ky., 326, this court said:

"A jury selected in contravention of the statutory provision quoted is certainly a ground for new trial, if proper objection be saved, or unless the irregularity is waived. Weil v. Kreutzer, 134 Ky., 563.

"If there are not as many as 18 qualified jurors on the regular panel, the statute gives the court power to call three from the bystanders. If it be necessary to call more than three, then resort must be had to the wheel. A list containing the names of more than three called from the bystanders to try a case is not a list of qualified jurors. Each party is entitled to have such a list before being compelled to exercise the right of challenge."

See also L. & N. R. R. Co. v. Owens, 164 Ky., 557.

It is apparent, therefore, that in selecting the jury, in the way it did, the trial court made a reversible error, and that the judgment should be reversed for this reason, if for no other.

But, as the case may be tried again, it will be proper to consider some of the other alleged errors.

3. It is next insisted that the circuit court erred in overruling the plaintiffs' motion to instruct the jury to find for the plaintiffs at the close of all the testimony. This contention is based upon the claim that Sherman Watson had produced no proof that either he or his brothers, under whom he claimed, had ever held the land adversely or in a hostile manner to the claims of the plaintiffs.

The proof shows that Sherman Watson bought the tract in question from his brother, Nathan Watson, by deed dated November 17th, 1905, and that Nathan Watson bought from Wash Watson, another brother, by a deed dated May 23rd, 1889, but acknowledged on November 17th, 1905.

To sustain the claim of adverse possession, Wash Watson testified that he cleared and fenced a small tract of about 15 or 20 acres within the boundary of the patent, in 1888. It is not contended, however, that Wash Watson ever lived upon his clearing.

It is insisted, however, that he made a survey, thereby obtaining calls for courses and distances, marked the lines upon the ground and then sold the land to his brother, Nathan Watson, by a title bond dated May 23rd, 1889, which was lost and has not been produced. Nathan built a small house upon the land, and lived in it a short time.

In 1905, Wash Watson made a deed to Nathan Watson, ante-dating it, however, to May 23rd, 1889, the alleged date of the lost title bond. It is claimed that Wash Watson held possession by reason of his fence and clearing for three or four years, although he never lived upon the land; that Nathan Watson held possession under his lost title bond from his brother Wash, about one year; that Nathan then conveyed to his brother, the defendant, Sherman Watson, by title bond dated 1895, and confirmed the sale by deed executed November 17th, 1905; and that Sherman has since held possession under this chain of title.

Appellants insist, however, that as Wash Watson never lived upon the land, his occupation was not adverse, and that the oldest title paper shown by the record is Nathan Watson's deed to Sherman Watson, dated November 17th, 1905. It is conceded that Wash had no title, or even color of title, when he claims to have made his clearing in 1888 or 1889.

It is claimed, however, that at that time, when Wash was only about 18 years of age, he surveyed the land and marked the boundary now claimed by possession; that he did this surveying by himself, without any assistance, being compassman, flagman, chain carrier and marker, all in one; although he had no education, and had had no previous instruction, training or experience in surveying, and had never done any work of that char-

acter. On the trial Wash Watson admitted that his education as a surveyor was limited to his having looked at a compass; and when asked, he could not explain what the call "N. 25 W." meant; and, he did not know how to read a compass, or how many feet there were in a pole, or how many steps in a pole. Nevertheless, he testified that he took a small pocket compass, about the size of a silver dollar, or an old-fashioned cap-box, without legs, tripod, or Jacob's staff, and laid it on the ground, or on a chunk, got his course and stepped off the distance, reducing the steps to poles, and wrote out the calls, giving the courses in degrees, and the distances in poles; and that the courses and distances thus obtained are those used in all the subsequent title bonds and deeds to the land in controversy, to the present day. Wash further says he marked those lines on the ground at the time he did this surveying, and it is to those marked lines that title is now claimed by adverse possession.

It was shown by Jesse Wilder, a witness for the defendants, and a land surveyor of thirty years' experience, that he resurveyed these lands in 1914, according to the courses and distances claimed to have been originally made by Wash Watson's cap-box survey, in 1888, and that he found marked lines and objects on the ground corresponding accurately with the calls of Wash Watson's survey; that the degrees and distances were as accurate as any he ever ran; that the original survey he was retracing was well made; that the man who made the original survey must surely have had a land compass to make it with; that no man without a chain could have made so accurate a survey with a pocket compass; and, that the witness, with thirty years' experience as a surveyor, could not have made the survey in the way that Wash Watson claimed he made it, 26 years ago.

The testimony further shows that Musgrove made a survey of the land in 1905, and that the survey thus made is substantially the description that is copied into the deed from Nathan to Sherman Watson, on November 17th, 1905. And appellants insist that the Musgrove survey was used as the basis of the description in that deed.

There is much strength in this contention. The appellants insist that an eighteen-year-old boy, with not exceeding six months' schooling, and wholly without edu-

.cation or experience in surveying, who had not during the 26 years that have since elapsed learned how to read a compass, or how many feet there are in a pole, could not possibly take a pocket compass, lay it on the ground and locate and follow the correct course, then step off the distances and reduce his steps accurately to poles, and thus survey a hundred acres of rough mountain land, without assistance, and make as good and correct a survey as could be made by an educated surveyor with 30 years' experience. We have no hesitation in saying that we consider Wash Watson's story of this survey as apocryphal. To dignify it by calling it proof, would make the trial of this case a travesty.

Furthermore, we are satisfied from the proof that the first survey of this land was made by Musgrove in 1905, about nine years before the trial, and about the time the deed from Nathan to Sherman Watson was drawn. It should not be overlooked that defendants do not claim that any survey was made or any lines marked, between the time Wash Watson claimed to have made his survey in 1888, and the time Musgrove surveyed it in 1905; and if Wash Watson did not make the survey, as he claims in 1888, the land was never surveyed nor the lines marked until 1905.

Musgrove was not introduced as a witness; but Wilder, who surveyed the lands in 1914, testified that the marks looked as though they had been lately made, and were about 9 or 10 years old. This would correspond with the date of the Musgrove survey of 1905.

Furthermore, when it is remembered that the oldest title paper mentioned in the record—the deed from Nathan to Wash Watson—was drawn in 1905, thereby corresponding, in time, substantially with the Musgrove survey, the conclusion would seem to be irresistible that there was no marked boundary around the disputed land until it was surveyed by Musgrove in 1905; and, consequently, that there could have been no adverse possession beyond the enclosure, prior to that time.

In this connection, appellants contend that Sherman Watson's possession being that of a joint tenant, was not adverse to their ownership as joint tenants, at any time.

Mrs Troxell testified that Sherman Watson entered upon the land in question as her tenant in 1892, about 18 years before the trial, when she, then having possession of the land for herself and the other Winchester

heirs, told Sherman he could go on the land in question, live on it and look after it, and keep trespassers from cutting timber; and that she explained to him how the title was held by the heirs of Joseph Winchester. She says Sherman Watson never claimed the land by adverse possession while he lived there under her; and, in this, she is corroborated by her son, Joe Neally Troxell. Sherman Watson, however, contradicts Mrs. Troxell and her son, in this respect.

Mrs. Troxell further testified that her father gave her the land in exchange for a cow, and delivered the patent to her, but that she never claimed more than her part as an heir, and that she and the others heirs paid the taxes. She sold her interest to Sherman Watson on January 4th 1901, while he was living on the land.

So, from this testimony, it would appear Sherman Watson went on the land as a tenant of the heirs about 1892; and, if this be true, his possession was never adverse, since it was amicable while he was holding under Mrs. Troxell, and it was a joint possession after the purchase from her in 1901. His possession as joint tenant was the possession of the other joint tenants as well. Johnson v. Myer, 168 Ky., 430.

In Kidd v. Bell, 122 S. W., 236, this court, in considering what would amount to adverse possession by one joint tenant against another, said:

"Practically all of this land is wild mountain land, valuable only for its timber and minerals. The heirs of William Carson resided chiefly in the West, and there is no evidence that any of them knew that appellant was laying claim to any portion of the land except the interests which he had purchased, and as all deeds under which he acquired these interests referred to the land as undivided sixth interests, etc., by each separate purchase he became a joint tenant or tenant in common with the remaining owners thereof; and, while it is possible for a joint tenant or tenant in common to hold adversely to his co-tenant, as said by this court in the case of Vermillion v. Nickell, 114 S. W., 270, to make the possession of a tenant in common adverse to the co-tenant, the possession must be open, notorious, and hostile to the other co-tenant, and known by him to be so."

In the late case of Johnson v. Myer, 168 Ky., 432, it was further said:

"It is well settled that where one joint tenant is in possession of the whole tract, the presumption is that he is keeping possession not only for himself, but for his co-tenant, according to their respective rights. In such a case an ouster will not be presumed from the mere fact of sole possession, which is the extent of the proof in this case. * * *

"That one co-tenant may oust another co-tenant by some act or declaration inconsistent with the latter's title, there can be no doubt; but, in order to thus effect an ouster, there must be some act or declaration inconsistent with the right of the excluded co-tenant, of which he must be apprised. Or, as was said in Frazier v. Morris, 161 Ky., 76: 'Where a possession is in its origin amicable, it will not become adverse so as to set the statute running unless the property is, in fact, held adversely and in such a manner as to apprise the other party, or a person of ordinary prudence, that the holding is adverse. Padgett v. Decker, 145 Ky., 227, 140 S. W., 252, and cases therein cited.' " See 2 C. J., page 267, and 1 R. C. L., page 741, to the same effect.

The testimony of Mrs. Troxell is sustained, to some extent, by the language of her deed to Sherman Watson, by which she conveyed to him her undivided interest in the land; she did not claim to convey the whole title.

So far as this record shows, Sherman Watson never made it known to any one that he was claiming adversely to the heirs of Joseph Winchester. McClanahan v. Brown, 157 Ky., 453. He acquired his title to a one-half interest in the tract from Mrs. Troxell and her sisters, and presumably entered under them; and at no time did he let the appellants know that he was claiming otherwise than as joint tenant. Being a joint tenant, he had the right to enter; and, in the absence of a contrary showing, it will be presumed that his possession under such an entry was amicable. 2 C. J., p. 264.

It should not be overlooked that Sherman Watson bought Mrs. Troxell's interest in January 1901, nearly five years before he claimed to have bought the entire tract from his brother Nathan, in November, 1905, and that Mrs. Troxell's deed, by its terms, only conveyed an undivided interest, while the deed of the other three sisters, made in 1912, likewise conveyed to Watson only an undivided three-fourths interest. These conveyances, and their acceptance by Watson, show that he was not

then claiming adversely to anyone, but thought he was acquiring the entire interest by his purchases from the Kentucky heirs.

Our conclusion upon this point is, that while there is a modicum of proof tending to show that Sherman Watson held adversely to appellants, the decided weight of the proof is the other way, and that the verdict should have been set aside as being flagrantly against the evidence.

4. Instruction No. 1 on adverse possession is criticised because it authorized a finding for the defendants if they, for a period of 15 years or more next before the commencement of the action, "held and claimed said lands" adversely, &c. This instruction is substantially a copy of the instruction given in LeMoyne v. Neal, 158 Ky., 319, where we said that the word "held" was not sufficient to take the place of the word "possession," in an instruction on adverse possession.

In that case, we said:

"It will be observed that the latter part of instruction No. 1 on adverse possession authorizes a finding in favor of defendant if the defendant, for a period of 15 years or more next before the commencement of the action 'held and claimed said lands against the plaintiff LeMoyne and all persons whomsoever, openly, notoriously, continuously, uninterruptedly, visibly and adversely.' In view of the fact that the jury may not understand the meaning of the word 'held,' we do not regard it as sufficient to take the place of the word 'possession.' It is better to use the stereotyped expression, 'actual, open, notorious, continuous, adverse and peaceable possession.' "

Upon another trial, the court will correct this instruction, in this respect, if there should be sufficient proof to submit the case to the jury.

5. The objection now taken to the misconduct of counsel for the appellees in his argument to the jury, is not subject to review, because it does not appear, except in the grounds for a new trial, that any objection was made at the time the statement was made. Saylor v. Commonwealth, 22 Ky. L. R., 1151, 64 S. W., 855; Jenkins v. Chism, 25 Ky. L. R., 736, 76 S. W., 405.

6. Appellants' claim for damages for wanton waste is based on sections 2332 and 2334 of the Kentucky Statutes, which read as follows:

"2332. If a tenant in common, joint tenant, or parcener commit waste, he shall be liable to his co-tenants jointly and severally for damages.

"2334. If, in any action for waste, the jury find that the waste was wantonly committed, judgment shall be entered for three times the amount of the damages assessed."

It is well settled, both by statute and by the adjudications of this court, that a tenant in common cannot lawfully sell timber from land jointly owned with others, without their consent. Nevels v. Kentucky Lumber Co., 108 Ky., 550, 49 L. R. A., 416; Burt & Brabb Lumber Co. v. Clay City Lumber Co., 111 Ky., 725. The rights and remedies of co-tenants in such cases are pointed out in the Nevels case, above cited.

But, as appellants did not offer any instruction on this subject, they cannot now complain of the court's failure to instruct upon the question. C., N. O. & T. P. R. R. Co. v. Curd, 22 Ky. L. R., 1222, 60 S. W., 297; Louisville Ry. Co. v. Blum, 28 Ky. L. R., 253, 89 S. W., 186; S. C. & C. St. Ry. Co. v. Core, 29 Ky. L. R., 839, 96 S. W., 562; Bell v. Louisville Ry. Co., 148 Ky., 189.

Judgment reversed and action remanded for further proceedings consistent with this opinion.